IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 14, 2004

## ROBERT ALLEN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Hamblen County**
**No. 03-CR-279     James E. Beckner, Judge**

_____

**No. E2004-00900-CCA-R3-PC - Filed February 16, 2005**

_____

The petitioner appeals the denial of his petition for post-conviction relief from his convictions for aggravated robbery, aggravated assault, and second degree murder, raising two claims: (1) that he was denied the effective assistance of trial counsel; and (2) that his guilty pleas were not knowing and voluntary. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

William E. Phillips, II, Rogersville, Tennessee, for the appellant, Robert Allen.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Paige Collins, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On October 11, 2002, the petitioner, Robert Allen, pled guilty in the Hamblen County Criminal Court to aggravated robbery, a Class B felony; aggravated assault, a Class C felony; and second degree murder, a Class A felony. Pursuant to the terms of his plea agreement, he was sentenced as a Range I, standard offender to an effective sentence of twenty years. The facts of the underlying crime are contained primarily in the transcript of the preliminary hearing held on November 1, 2001. On October 20, 2001, the petitioner and a codefendant, Jimmy Tucker, went to the apartment of Lamont Simpson in Morristown, while a third codefendant, Regina Tucker, waited in the car. Apparently, Simpson had shot at Tucker earlier in the day, and the petitioner and Tucker were going to "get even" with Simpson by shooting him. At the door of Simpson's apartment, the three conversed for a few minutes and then the petitioner pulled out a gun. Simpson slammed the

apartment door, and the petitioner fired the gun through the door. He and Tucker then shot through the window, and one of the bullets struck Christina Clark, an occupant of the apartment, in the head, killing her. The petitioner and the Tuckers fled from the scene, and the petitioner later stole a pickup truck and $5.00 at gunpoint from Joshua Heft. The petitioner was subsequently arrested and charged in an information by the district attorney general with aggravated assault on Simpson, aggravated robbery of Heft, and second degree murder of Clark. The petitioner pled guilty based on the information and waived his right to presentment or indictment by the grand jury.

On September 29, 2003, the petitioner filed a *pro se* petition for post-conviction relief alleging, *inter alia*, that he received ineffective assistance of counsel, that his guilty pleas were unknowing and involuntary, that he was coerced by his family, at the behest of trial counsel, into pleading guilty, and that a motion to withdraw the guilty pleas should have been filed based on newly discovered evidence. Post-conviction counsel was appointed, and counsel filed an amended petition, restating essentially the same grounds for relief. Although the petitioner made a variety of allegations in his two petitions and at the evidentiary hearing of ineffective assistance, he confines himself on appeal to arguing that trial counsel was ineffective because counsel's investigator gave the petitioner erroneous legal advice, which was not corrected by counsel, and, as a result, his pleas were unknowing and involuntary.

Although on appeal, as we understand the petitioner's claims, his argument of ineffective assistance of counsel is focused only on the assertion that trial counsel failed to correct erroneous or incomplete legal advice given by their investigator, which caused the petitioner to involuntarily plead guilty, we will review in detail the testimony at the evidentiary hearing.

The investigator who assisted defense counsel in defending the petitioner testified that he had been an investigator with the public defender's office for approximately thirteen years and had conducted an independent investigation into the facts of the petitioner's case, including the interviewing of witnesses. He obtained information not revealed by discovery, including the fact that the police department had "failed to retrieve some valuable information," such as the doors and windows containing the bullet holes. He met "several times" with the petitioner but never gave the petitioner any legal advice. He stated that he obtained the petitioner's criminal record and reviewed that history with the petitioner while the petitioner was incarcerated. He said that trial counsel met with the petitioner "way more than three times," and a defense strategy had been developed, which was also explained to the petitioner. This strategy was based on their examination of various witnesses and the evidence in the case, as well as visiting the crime scene and taking "numerous photographs." The defense team had also obtained the only written statement from the victim, Lamont Simpson, who said he had shot at codefendant Jimmy Tucker several days prior to the incident in question. The petitioner was given copies of materials received in the discovery process and wrote several letters to defense counsel indicating certain avenues of defense.

The petitioner's trial counsel testified that, as a result of a probation violation in general sessions court, the petitioner had been in jail for about a year before the guilty pleas. Counsel met with the petitioner "on a number of occasions" during that year, including some meetings at which

the investigator was present. He informed the petitioner that the State had set a deadline for accepting the plea agreement, otherwise it intended to seek an indictment before the grand jury for first degree murder. Asked if any of his actions might have coerced the petitioner into pleading guilty, counsel responded that he simply informed the petitioner of the State's intent to indict him for first degree murder:

> I don't think that what I said to him, except that I -- the facts were that if he did not accept this offer he was going to be indicted. I didn't tell him that he would get a life sentence or that any other thing, because you can't predict the outcome of that. But he was told that the grand jury -- the attorney general's office would seek indictment for felony murder, first degree murder if this plea wasn't accepted.

He told the petitioner that, if the plea were not accepted, "the offer that they had made to him would terminate."

The petitioner testified he learned the public defender's office was representing him right before the preliminary hearing. He said that, during this representation, he met with the investigator and trial counsel one time, a week before he pled guilty. Counsel told him that the State had set a Friday deadline for accepting the plea agreement and that if he did not accept, the State intended to "serve first degree murder indictments . . . conspiracy to commit first degree murder, attempted first degree murder on Lamont Simpson, and aggravated assault and aggravated robbery." Once these indictments were served, the best plea that counsel would be able to obtain would be a "life sentence." This information made the petitioner feel "hopeless," made even more so by the fact that his criminal record could be used against him if he had gone to trial rather than pled guilty. Concerning his prior criminal record, the petitioner stated, "I've got a history and I'm not proud of it. And I know that I've done wrong in the past and I've had to lie in the past." He said that an "Officer Green" from Greene County had offered to provide favorable testimony for the petitioner, but trial counsel did not contact Officer Green. He said he met with lead trial counsel only three or four times in the year leading up to his plea agreement. He said that trial counsel never filed any motions in the case, and "[i]t was just like he told me he could not win at trial." He described the "hopelessness" of the situation, stating, "I trusted him. And all this time, I mean -- I know I'm not guilty of the crime but in a sense talking to him, the more I talked to him, the more I felt like I was guilty. And then . . . it was like just messing with my mind." He said he did not remember signing a grand jury waiver form and never received a copy of any indictment, only an information. Asked why he responded affirmatively at the guilty plea hearing concerning the voluntariness of his pleas, the petitioner said trial counsel "was standing right beside of [him]," telling him to say "yes, sir." Although the petitioner stated that trial counsel went over the law and the State's burden of proof, he was never informed that he could be found guilty of a "way lesser crime." The best he could hope for at a trial would be a guilty verdict for first degree murder, which made him feel like he was going to "get fried."

On cross-examination, the petitioner acknowledged he was given materials received from the State in the discovery process, but counsel never reviewed it with him to develop a trial strategy.

-3-

He was told that both of his codefendants had "turned state's evidence" and were going to testify against him. Everything he was told, by his view, was "a total coercion" to convince him to plead guilty in order to "make their job easier."

Lead trial counsel testified he had handled "forty or fifty" murder cases in the past. During this representation, he met with the petitioner "twenty to forty times, conservatively; maybe fifty," and reviewed with him "[e]very piece of evidence . . . received by virtue of . . . discovery motions with the state," as well as possible trial strategies. He identified two of the motions he filed on behalf of the petitioner and said that he gave him copies of laws and statutes because he wanted to review and study them. Even though the petitioner had not been indicted yet, counsel filed an "ex parte motion" in order to obtain the services of a jury selection expert. He also went through the sentencing aspects "time and time again" with the petitioner and advised him that once an indictment was returned, "it would have been much more difficult to get any sort of plea agreement similar" to what he was offered. He stated that the petitioner's guilty plea hearing reflects that the petitioner was "able to talk at will" and that counsel was "as loose as I've ever been with a defendant on a plea so he could say anything that he likes."

On April 14, 2004, the post-conviction court entered written findings of fact and conclusions of law denying the petitioner relief on his claims, and this appeal followed.

## ANALYSIS

### I. Post-Conviction Standard of Review

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f) (2003). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns, 6 S.W.3d at 461.

### II. Ineffective Assistance of Counsel

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App.

1997), perm. to appeal denied (Tenn. 1998) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S. Ct. at 2064.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). When analyzing a petitioner's allegations of ineffective assistance of counsel, this court must indulge in a strong presumption that the conduct of counsel fell within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, 104 S. Ct. at 2066, and may not second-guess the tactical and strategic choices made by trial counsel unless they were uninformed because of inadequate preparation, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. When a petitioner's ineffective assistance claim is made in the context of a conviction stemming from a guilty plea, he must prove a reasonable probability that were it not for deficiencies in his counsel's performance, he would not have pled guilty but instead would have insisted on going to trial. See Shazel v. State, 966 S.W.2d 414, 416 (Tenn. 1998) (quoting Hill v. Lockhart, 474 U.S. 52, 59, 106 S. Ct. 366, 370-71, 88 L. Ed. 2d 203 (1985)). "In cases involving a guilty plea or plea of nolo contendere, the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998) (citing Hill, 474 U.S. at 59, 106 S. Ct. at 370; Bankston v. State, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991)).

Because both prongs of the test must be satisfied, a failure to show either deficient performance or resulting prejudice results in a failure to establish the claim. See Henley, 960 S.W.2d at 580. For this reason, courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S. Ct. at 2069; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner contends on appeal that the evidence shows that trial counsel was deficient in that their investigator gave the petitioner erroneous legal advice, namely by telling him that if he went to trial, his criminal record would be used to impeach him, without also explaining the Rules of Evidence and steps that could be taken to prevent the use of the prior criminal record. In addition, according to the petitioner, trial counsel knew "or should have known" of this erroneous legal advice but took no steps to correct the investigator. The petitioner argues that "but for" this advice, the result of the proceeding would have been different, namely, he would not have pled guilty but would have insisted on going to trial.

We note that, in his testimony during the evidentiary hearing, the petitioner testified as to numerous alleged shortcomings of trial counsel and their investigator. However, he did not single out and claim, as he now does on appeal, that he would not have pled guilty absent the alleged erroneous information from the investigator as to the use the State would make of prior convictions. In fact, as we understand the petitioner's testimony, he received erroneous legal advice during only one meeting with the investigator. His explanation as to this advice was only a very small part of his testimony at the hearing and one of numerous claims of ineffective assistance of counsel. As we read the claim, which he pressed at the hearing, he was pressured into pleading guilty. The post-conviction court found that, in fact, his pleas were informed and voluntary. Not surprisingly, the post-conviction court did not make a specific finding as to the erroneous advice claim which is the centerpiece on appeal, for at the post-conviction hearing, it was presented only in passing as one of many examples of ineffective assistance of counsel, the others of which are no longer being pursued. However, we will review the petitioner's appellate claims as best the record permits.

At the plea submission hearing, after explaining each of the charges to the petitioner and what the State would have to prove at trial, the trial court explained the range of punishment and release eligibility for each of the charges. The trial court next inquired into the petitioner's understanding of his plea agreement with the State:

> THE COURT: All right. Is this your signature on this paper waiving your rights and pleading guilty to those charges?
>
> [THE PETITIONER]: Yes, sir.
>
> THE COURT: Have you read it, and do you understand it?
>
> [THE PETITIONER]: Yes, sir.
>
> THE COURT: Has [trial counsel] explained it to you?
>
> [THE PETITIONER]: Yes, sir.
>
> THE COURT: Do you understand that you have a right to a jury trial, which no one can take from you unless you waive it?

-6-

[THE PETITIONER]: Yes, sir, I do.

. . . .

THE COURT: That you have a right to remain silent or against self-incrimination, you do not have to say or do anything at anytime that would incriminate you in these charges and, further, if you chose to go to trial, you would not have to take the witness stand and testify and, if you did not, that fact could not be held against you, *and a prior record could not be brought out against you*? (emphasis added).

[THE PETITIONER]: Yes, sir.

. . . .

THE COURT: Now is when I will explain to you about a best-interest plea. Under United States Supreme Court case of <u>North Carolina versus Alford</u>, a person can plead guilty even though they maintain their innocence if certain circumstances exist, three in particular: Number one, you have to believe that from your knowledge of the evidence against you in the case, that if you went to trial, you probably would be found guilty of the offense to which you're pleading guilty to; and, number two, you have to believe that this disposition is a fair disposition to you; and, number three, you have to believe that it is in your best interest under all the circumstances to enter a plea of guilty as you are doing.

[THE PETITIONER]: Your Honor, did you say that I have to believe that it isn't fair?

THE COURT: No. No, sir. I said that you have to believe that it is fair to you.

[THE PETITIONER]: Okay.

. . . .

THE COURT: Do you believe all those things?

[THE PETITIONER]: Yes, sir, I do.

THE COURT: Under those circumstances, are you pleading guilty freely and voluntarily of your own free will?

[THE PETITIONER]: Yes, sir.

THE COURT: Any force or threats of any kind used against you to cause you to plead guilty?

[THE PETITIONER]: No, sir.

THE COURT: Or has anybody promised you anything except for this agreement that you've reached –

[TRIAL COUNSEL]: He turned to me. I need to know what –

([The petitioner] and [trial counsel] confer off record.)

[THE PETITIONER]: I understand, your Honor.

THE COURT: I overheard what you said there. If this went to the grand jury on charges of first degree murder, that's not force or threats; what I'm talking about, if the grand jury came back with a greater charge, that would be for the grand jury to determine what the charges would be, and the fact that you might take advantage of the state and the victim's family giving you an opportunity to plead to something less by information is not force. But are there any other kinds of force or coercion of any kind used against you?

[THE PETITIONER]: No, sir.

. . . .

THE COURT: Do you understand what the agreement that you've reached is?

[THE PETITIONER]: Yes, sir.

We note that as the petitioner was being advised of his rights at the submission hearing, he specifically was told that if he chose not to testify at trial, then his criminal record would not be brought out against him. He responded that he understood this and his other rights and made no inquiries in this regard to the trial court. Additionally, although given an additional opportunity to speak, the petitioner expressed no dissatisfaction with the performance of defense counsel:

THE COURT: Okay. All right. Are you satisfied with the representation of you by your lawyer . . .?

[THE PETITIONER]: Yes, sir.

THE COURT: Any complaint in any way about how he's represented you?

[THE PETITIONER]:  No, sir.

THE COURT:  Anything that I've told you or asked you that you don't understand?

[THE PETITIONER]:  No, sir.

In response to the central claim of the petitioner at the post-conviction hearing that his pleas were coerced, the post-conviction court found they were free and voluntary.  The record fully supports this determination.  Additionally, the post-conviction court found that the petitioner failed to show any deficiency in trial counsel's representation or that he was in any way prejudiced by counsel's performance.  The record fully supports these findings as well.  It is clear that the petitioner was given ample opportunity at the submission hearing to tell the court that he was being pressured into pleading guilty but did not do so.  Further, he did not question the court about how his prior record could be utilized or voice any complaints against trial counsel.

At the evidentiary hearing, the scant testimony by the petitioner concerning this "erroneous" advice by the defense investigator occurred during the following exchange when he was asked about how the performance of trial counsel had affected him prior to his pleas of guilty:

> A       It made me -- It was like it was hopeless.  It was like they wasn't even going to try.  And then you've got [the defense investigator] sitting here telling me that if I try to go to trial that my prior record and prior dealings with the police and all this would make me out to be a liar and make me look bad and everything that I've done in the past that I was probably ashamed of would come out and all this, and I'm like, you know –
>
> Q       Did [the investigator] explain to you the Rules of Evidence about bringing out prior criminal histories of criminal defendants?
>
> A       No, sir.

The defense investigator, when asked about this conversation, acknowledged he discussed with the petitioner his record of convictions but denied that he gave the petitioner legal advice:

> Q       Do you recall having told [the petitioner] that the state would bring out his potential - - any potential past record that he might have against him at trial and that in doing so, it would make him out to be a liar?
>
> A       I don't believe that's legal advice, but I did have a conversation and went over his criminal history that I received from the Hamblen County Sheriff's Department and pointing out to him that in 8-9 of '86 - - -

Q       Without going specifically into the criminal history, [defense investigator], you did - -

A       That's the answer to your question, sir.

Q       Yeah, I understand. I think you've answered it. You did go over his criminal history with him and tell him that the state would bring that out against him?

A       Yes, sir.

Q       Did you also explain to him the rules of criminal procedure?

A       I was probably included in a discussion with [trial counsel]. At many times we had discussed this with him.

Q       So you yourself, after telling him that they could use this past record against him, did not inform him that that could only be brought out in certain occasions?

A       I explained when he asked questions about if he took the witness stand and he made certain statements and opened the door that a pattern could be established by his past record.

Q       Okay. I have no further questions, your Honor.

Since the petitioner's criminal history is not included in the record on appeal, we cannot assess what its impact might have been had the State been allowed to utilize it in some fashion during a trial. Regardless, the petitioner has failed to show by clear and convincing evidence that his conversations with the defense investigator constituted "erroneous legal advice," or legal advice at all and how he was prejudiced by it.[1] The record supports the court's determination in this regard.

### III. Voluntariness of Guilty Plea

As a corollary to his first claim, that counsel was ineffective, the petitioner also claims that his decision to plead guilty was not voluntary but instead was the result of "misinformation" provided by the defense investigator, as well as the petitioner's resulting "ignorance as to his rights" and "misunderstanding of the law." We have already determined the record supports the post-conviction court's determination that trial counsel was not ineffective. We now will review whether the petitioner's pleas of guilty were unknowing and involuntary.

---

[1] We note that the petitioner has not alleged that he ever questioned or even discussed with trial counsel the alleged erroneous advice from the investigator.

When analyzing a guilty plea, we look to the federal standard announced in <u>Boykin v. Alabama</u>, 395 U.S. 238, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969), and the state standard set out in <u>State v. Mackey</u>, 553 S.W.2d 337 (Tenn. 1977). <u>State v. Pettus</u>, 986 S.W.2d 540, 542 (Tenn. 1999). In <u>Boykin</u>, the United States Supreme Court held that there must be an affirmative showing in the trial court that a guilty plea was voluntarily and knowingly given before it can be accepted. 395 U.S. at 242, 89 S. Ct. at 1711. Similarly, our Tennessee Supreme Court in <u>Mackey</u> required an affirmative showing of a voluntary and knowledgeable guilty plea, namely, that the defendant has been made aware of the significant consequences of such a plea. <u>Pettus</u>, 986 S.W.2d at 542. A plea is not "voluntary" if it results from ignorance, misunderstanding, coercion, inducements, or threats. <u>Blankenship v. State</u>, 858 S.W.2d 897, 904 (Tenn. 1993). The trial court must determine if the guilty plea is "knowing" by questioning the defendant to make sure he fully understands the plea and its consequences. <u>Pettus</u>, 986 S.W.2d at 542; <u>Blankenship</u>, 858 S.W.2d at 904.

At the post-conviction hearing, the petitioner stated he was not comfortable with the guilty plea but felt he had no choice:

> I still wasn't comfortable with the plea, but I felt like I had to take it. I mean I had to take it. And I wouldn't have took it -- I was ignorant to the law and I would not have took this plea if I'd -- if I had a lawyer that I thought was doing the best he could do. I thought he was at the time but, no.

Given the opportunity to question the court and voice complaints about the process or trial counsel, the petitioner, instead, kept silent, responding to the trial court's questions in such a fashion to show the pleas of guilty were free, voluntary, and informed.

## CONCLUSION

The evidence in the record fully supports the findings of the post-conviction court. Accordingly, we affirm the post-conviction court's denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE

-11-